# 13-1041-cr

# United States Court of Appeals

## for the

## Second Circuit

———◆❚◆———

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

– v. –

DAWN A. WHITE,

*Defendant-Appellant,*

JENNIFER T. FORD,

*Defendant.*

—————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK (ROCHESTER)

## BRIEF FOR DEFENDANT-APPELLANT
## DAWN A. WHITE

LAWRENCE MARK STERN
*Attorney for Defendant-Appellant
Dawn A. White*
100 Hudson Street, Suite 6A
New York, New York 10013
(212) 925-6863

TABLE OF CONTENTS

————————

Page

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . iii

STATEMENT PURSUANT TO RULE 28(a). . . . . . . . . . . 1

    A.   PRELIMINARY STATEMENT. . . . . . . . . . . . 1

    B.   ISSUES PRESENTED. . . . . . . . . . . . . . 1

    C.   STATEMENT OF FACTS. . . . . . . . . . . . . 2

        1.   The Evidence. . . . . . . . . . . . . . 2

        2.   Denial of Speedy Trial. . . . . . . . . 15

SUMMARY OF ARGUMENT.. . . . . . . . . . . . . . . . . 19

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . 23

    POINT I

    THE INTRODUCTION INTO EVIDENCE OF
    HEARSAY AND UNAUTHENTICATED BUSINESS
    AND PUBLIC RECORDS IDENTIFYING
    APPELLANT AND HER ALLEGED COCONSPIRATOR
    AS THE AUTHORS OF FALSE TAX RETURNS
    VIOLATED THE RULES OF EVIDENCE AND
    CONSTITUTIONAL DUE PROCESS, FAIR TRIAL
    AND CROSS-EXAMINATION, AND THE EVIDENCE
    WAS INSUFFICIENT AS A MATTER OF LAW. . . . . . . . 23

    POINT II

    THE EVIDENCE OF CONSPIRACY AND AIDING AND
    ABETTING WAS INSUFFICIENT AS A MATTER OF LAW,
    AND THE FAILURE OF DEFENSE COUNSEL TO MOVE TO
    TO DISMISS ON THIS GROUND DEPRIVED APPELLANT
    OF EFFECTIVE ASSISTANCE OF COUNSEL. . . . . . . . . 32

i

<u>POINT III</u>

THE FOUR YEAR DELAY OF TRIAL AND THE MORE
THAN 70 DAYS OF INCLUDABLE TIME BETWEEN
ARRAIGNMENT AND TRIAL DEPRIVED APPELLANT
OF HER STATUTORY AND CONSTITUTIONAL RIGHTS
TO A SPEEDY TRIAL, AND THE FAILURE OF
DEFENSE COUNSEL TO SO MOVE AND TO
INTRODUCE AT TRIAL EVIDENCE BELATEDLY
DISCLOSED BY THE GOVERNMENT RELEVANT TO
HER DEFENSE DEPRIVED HER OF EFFECTIVE
ASSISTANCE OF COUNSEL. . . . . . . . . . . . . . . 37

<u>POINT IV</u>

APPELLANT WAS SENTENCED IN VIOLATION OF
STATUTES, GUIDELINES AND CONSTITUTIONAL
DUE PROCESS OF LAW, AND DEFENSE COUNSEL'S
FAILURE TO OBJECT DEPRIVED APPELLANT OF
EFFECTIVE ASSISTANCE OF COUNSEL . . . . . . . . . . 50

1.  Losses Not Within the Scope of
    a Conspiratorial Agreement. . . . . . . . 51

2.  Unsophisticated Means.. . . . . . . . . . 53

3.  The Identification Adjustment.. . . . . . 57

4.  Non-relevant Conduct. . . . . . . . . . . 58

5.  Fixed Arbitrary Sentence Policy.. . . . . 63

6.  Drug Testing and Unreasonable
    Searches. . . . . . . . . . . . . . . . . 66

CONCLUSION. . . . . . . . . . . . . . . . . . . . . 70

## TABLE OF AUTHORITIES

Cases

Page
8

*Barker v. Wingo*, 407 U.S. 514 (1972) . . . . . . . . 40, 46

*Bollenbach v. United States*,
 326 U.S. 607 (1946). . . . . . . . . . . . . . 28, 36

*Davis v. Lafler*, 658 F.3d 525
 (6th Cir. 2011). . . . . . . . . . . . . . . . . 28

*Doggett v. United States*, 505 U.S. 647,
 652n.1 (1992). . . . . . . . . . . . . . . . . 45, 48

*Fiore v. United States*, 696 F.2d 205
 (2d Cir. 1982). . . . . . . . . . . . . . . . . 67

*Gall v. United States*, 552 U.S. 38, 47 (2007). . . . . . . 65

*Jackson v. Virginia*, 443 U.S. 307 (1979). . . . . . . 30, 36

*Kotteakos v. United States*, 328 U.S. 750 (1946). . 34, 35, 36

*Old Chief v. United States*, 519 U.S. 172 (1977). . . . . . 32

*Rita v. United States*, 551 U.S. 338, 351 (2007). . . . . . 65

*Samson v. California*, 547 U.S. 843 (2006). . . . . . . . 68

*Strickland v. Washington*, 466 U.S. 668
 (1984). . . . . . . . . . . . . . 37, 40, 50, 53, 57, 64

*United States v. Abad*, 514 F.3d 271 (2d Cir. 2008). . . . 40

*United States v. Abrar*, 58 F.3d 43 (2d Cir. 1995). . . . . 70

*United States v. Anderson*, 902 F.2d 1105
 (2d Cir. 1990). . . . . . . . . . . . . . . . . 40, 45

iii

Page

*United States v. Atlantic States Cast Iron Pipe Co.* 627 F. Supp. 180 (D. N.J. 2009). . . . . . 61, 63

United States v. Baez, 944 F.2d 88, 90n.1
(2d Cir. 1991). . . . . . . . . . . . . . . . . . . 57

*United States v. Ballard*, 919 F.2d 255
(5th Cir. 1990). . . . . . . . . . . . . . . . . . 62

*United States v. Bello*, 310 F.3d 56
(2d Cir. 2002) . . . . . . . . . . . . . . . . . . 67

*United States v. Bermudez*, 526 F.2d 89
(2d Cir. 1975). . . . . . . . . . . . . . . . . . 29

*United States v. Blechman*, 657 F.3d 1052,
1065-66)(10th Cir. 2011). . . . . . . . . . . . . 25

*United States v. Brown*, 402 F.3d 113
(2d Cir. 2005). . . . . . . . . . . . . . . . . . 67

*United States v. Carini*, 562 F.2d 144, 151-52
(2d Cir. 1977). . . . . . . . . . . . . . . . . . 47

*United States v. Cruz*, (363 F.3d 187
(2d Cir. 2004). . . . . . . . . . . . . . . . . . 35

*United States v. Didier*, 542 F.2d 1182
(2d Cir. 1976). . . . . . . . . . . . . . . . . . 47

*United States v. DiStefano*, 555 F.2d 1094
(2d Cir. 1977). . . . . . . . . . . . . . . . . 29-30

*United States v. Eng*, 14 F.3d 165, 172n.5
(2d Cir. 1994). . . . . . . . . . . . . . . . . . 57

*United States v. Executive Recycling, Inc.*,
___ F. Supp.2d ___, 2013 WL 3010821*26
(D.Col. June 17, 2013). . . . . . . . . . . . . . 54

Page

*United States v. Fitzgerald*, 232 F.2d 315
    (2d Cir. 2000). . . . . . . . . . . . . . . . 62

*United States v. Freeman*, 498 F.3d 569
    (2d Cir. 1974). . . . . . . . . . . . . . . 28, 36

*United States v. Gradagno*, 766 F.Supp. 617
    (N.D. Ill. 1991). . . . . . . . . . . . . . . 61

*United States v. Hamilton*, 334 F.3d 170, 180
    (2d Cir. 2003). . . . . . . . . . . . . . . . 36

*United States v. Heras*, 2009 WL 1874373
    (E.D.N.Y. 2009)(Sifton, J.) . . . . . . . . . . 28

*United States v. Johnson*, 513 F.2d 819
    (2d Cir. 1975). . . . . . . . . . . . . . . . 29

*United States v. Johnson*, 117 F.3d 1010
    (7th Cir. 1997). . . . . . . . . . . . . . . 63

*United States v. Kelley*, 305 Fed. Appx 705, 708
    (2d Cir. 2009). . . . . . . . . . . . . . . . 24

*United States v. Knights*, 534 U.S. 112 (2001).. . . . . . 69

*United States v. Lekacos,* 151 F.2d 170, 173
    (2d Cir. 1945). . . . . . . . . . . . . . . . 35

*United States v. Leung*, 40 F.3d 577, 586n.2
    (2d Cir. 1994). . . . . . . . . . . . . . . . 57

*United States v. Lifshitz*, 369 F.3d 173
    (2d Cir. 2004). . . . . . . . . . . . . . . . 69

*United States v. Lynch*, 726 F.3d 346
    (2d Cir. 2013). . . . . . . . . . . . . . . . 40

*United States v. Martin*, 157 F.3d 46
    (2d Cir. 1998). . . . . . . . . . . . . . . . 62

Page

*United States v. Melot*, 732 F.3d 1234
(10th Cir. 2013). . . . . . . . . . . . . . . . . . 62

*United States v. Mitchell*, 49 F.3d 769
(D.C. Cir. 1995). . . . . . . . . . . . . . . . . . 25

*United States v. Myers*, 426 F.3d 117
(2d Cir. 2005). . . . . . . . . . . . . . . . . . . 67

*United States v. Natale*, 526 F.2d 1160
(2d Cir. 1975). . . . . . . . . . . . . . . . . . . 26

*United States v. Nettles*, 570 F.2d 547
(5th Cir. 1976). . . . . . . . . . . . . . . . . . 35

*United States v. New Buffalo Amusement Corp.*,
600 F.2d 368, 278 (2d Cir. 1979). . . . . . . . . . 46

*United States v. Nusraty*, 867 F.2d 759
(2d Cir. 1989). . . . . . . . . . . . . . . . . . . 30

*United States v. Olano*, 507 U.S. 125 (1993). . . . . . . 36

*United States v. Powell*, 124 F.3d 655
(5th Cir. 1997). . . . . . . . . . . . . . . . . . 62

*United States v. Reeves*, 591 F.3d 77
(2d Cir. 2010). . . . . . . . . . . . . . . . . . . 70

*United States v. Reyes*, 157 F.3d 949
(2d Cir. 1998). . . . . . . . . . . . . . . . . . . 25

*United States v. Rosenblatt*, 554 F.2d 36, 40
(2d Cir. 1977). . . . . . . . . . . . . . . . . . . 34

*United States v. Sabbeth*, 262 F.2d 207
(2d Cir. 2001). . . . . . . . . . . . . . . . . . . 61

*United States v. Sash*, 396 F.3d 515
(2d Cir. 2005). . . . . . . . . . . . . . . . . . . 58

Page

*United States v Schwarz*, 500 F.2d 1350,
    1351-52 [2d Cir. 1974]. . . . . . . . . . . . . . . 66

*United States v. Sofsky*, 287 F.3d 122, 125
    (2d Cir. 2002). . . . . . . . . . . . . . . . 57, 67

*United States v. Studley*, 47 F.3d 569
    (2d Cir. 1995). . . . . . . . . . . . . . . . . . 52

*United States v. Szur*, 289 F.3d 200
    (2d Cir. 2002). . . . . . . . . . . . . . . . . . 61

*United States v. Thompson*, 2009 WL 2433477
    (S.D.N.Y. 2009) . . . . . . . . . . . . . . . . . 24

*United States v. Triumph*, 2004 WL 1920352
    (D. Conn. 2004). . . . . . . . . . . . . . . . . 26

*United States v. Triumph Capital Group*,
    260 F.Supp.2d 432, 438 (D. Conn. 2002). . . . . . . . 34

*United States v. Valdez*, 726 F.3d 684, 695
    (5th Cir. 2013). . . . . . . . . . . . . . . . . 56

*United States v. Young*, 745 F.2d 733
    (2d Cir. 1984) . . . . . . . . . . . . . . . 28, 36

## Statutes and Rules

*18 U.S.C.§286*. . . . . . . . . . . . . . . . . . 1, 58

18 U.S.C.§287. . . . . . . . . . . . . . . . . . . 58

18 U.S.C.§3161(h)(7)(A). . . . . . . . . . . . . . . 42

*18 U.S.C.§3161(h)(7)(c)*. . . . . . . . . . . . . . 42

*18 U.S.C.§3563(a)(5)*. . . . . . . . . . . . . . . 67

*18 U.S.C.§3583(d)*. . . . . . . . . . . . . . . . 67

Page

*F.R. Crim.P.* 32(b) . . . . . . . . . . . . . . . . . 36

*F.R. Evid. 104(a)* . . . . . . . . . . . . . . . . . 32

*F.R. Evid. 404(b)* . . . . . . . . . . . . . . . . . 32

*F.R. Evid. 803(6)(A)* . . . . . . . . . . . . . . . 25

*F.R. Evid. 803(6)(E)* . . . . . . . . . . . . . . . 25

F.R. Evid. 805 . . . . . . . . . . . . . . . . . . . 31

U.S.S.G. 1B1.3(a)(2) . . . . . . . . . . . . . . . . 59

*U.S.S.G. 2B1.1.* . . . . . . . . . . . . . . . 52, 59

*U.S.S.G. 2B1.1(b)* . . . . . . . . . . . . . . . . . 63

U.S.S.G. 2B1.1(b)(10)(c) . . . . . . . . . . . . . . 53

U.S.S.G. 2B1.1(b)(11)(c)(i) . . . . . . . . . . . . . 58

U.S.S.G. 2B1.1 cmt.n. 8(B) . . . . . . . . . . . . . 56

U.S.S.G. 3D1.2(d) . . . . . . . . . . . . . . . . . 60

*U.S.S.G. 5D1.3(a)(4)* . . . . . . . . . . . . . . . 67

STATEMENT PURSUANT TO RULE 28(a)(3)

A.  Preliminary Statement

This is an appeal from a judgment of the United States District Court for the Western District of New York rendered on March 7, 2013, convicting appellant, after trial by jury, of conspiracy to make a false claim against the United States (18 U.S.C.§286) and three counts of making false claims against the United States (18 U.S.C.§287), and sentencing her to 33 months imprisonment concurrent on all counts, $67,926 restitution, and 3 years supervised release.

Appellant is incarcerated pursuant to the sentence.

Timely notice of appeal was filed, and this Court assigned Lawrence Mark Stern as counsel on appeal.

This Court has jurisdiction pursuant to 18 U.S.C.§3742(a) and 28 U.S.C.§§1291, 1294.

B.  Issues Presented

1.  Whether the introduction into evidence of hearsay and unauthenticated business and public records identifying appellant and her alleged coconspirator as the authors of false tax returns violated the rules of evidence and constitutional due process, fair trial and cross-examination, and whether the evidence was insufficient as a matter of law.

2.  Whether the evidence of conspiracy and aiding and abetting was insufficient as a matter of law, and whether the failure of defense counsel to move to dismiss on this

1

ground deprived appellant of effective assistance of
counsel.

     3.    Whether the four year delay of trial and the more
than 70 days of includable time between arraignment and
trial deprived appellant of her statutory and constitutional
rights to a speedy trial, and whether the failure of defense
counsel to so move and to introduce at trial evidence
belatedly disclosed by the government relevant to her
defense deprived her of effective assistance of counsel.

     4.    Whether appellant was sentenced in violation of
statutes, guidelines and constitutional due process of law,
and whether defense counsel's failure to object deprived
appellant of effective assistance of counsel.

C.    Statement of Facts

     1.    The Evidence

     The government introduced documentary evidence that

federal and New York State income tax returns were filed

electronically in appellant's name, and in the names of her

sisters, Jennifer Ford and Veronica White, her brother Bobby

White, and a man named Kevin Horsey, for the tax years 2004

and 2005. A total of fourteen such returns were filed or

attempted to be filed. All of them claimed false tax refunds

in amounts ranging from $3,162 to $21,491 (202-332, 1030-

86). Two of the 2004 returns, in the names of Bobby White

and Veronica White, and two of the 2005 returns, in the

names of Bobby White and appellant, were rejected

2

electronically. The falsely claimed refunds for the other ten tax returns were paid, a total of $95,379 (1041).

Documentary evidence showed that the claimed refunds were false: the amounts stated on the returns for the incomes earned and the taxes withheld, and the W-2 forms submitted with those returns, were false. In most cases, the names of the taxpayers on the returns were the same as the names of actual employees at the companies named as the employers on the returns and on the W-2's, but, according to the employment records of those companies, the named employees, including appellant and Ford, had earned substantially less money in 2004 and 2005; little or no taxes had been withheld, and no tax refunds were owed (347-439).

An employer named on one of the returns filed in appellant's name remembered her and identified her in court (386).[1] Records of the General Revenue Corporation also showed that appellant and her sister, Jennifer Ford, began working there on the same date, June 17, 2005 (364-82). An attempt was made to file a return for the tax year 2004 in

---

[1] The employer testified that appellant sold vacuum cleaners for the company as an independent contractor in 2004. As such she was issued 1099 forms for non-employee compensation, not the W-2 which was submitted with the return in her name. (384-92).

the name of Rafael Castano, a boyfriend of appellant's, but it was rejected four times. Mr. Castano testified that he did not know about it (888-89). A return filed in the name of Bobby White listed an employer for whom he had not worked, although he had applied for a job with the company. Jennifer Ford did work there for three days in 2004 (413-49).

The IRS return filed in the name of Jennifer Ford for 2004 included an earned tax credit for a child, based on the claim that her three year old niece had lived with her for eleven months during that year (286-88). Jennifer Ford's sister, Danielle Ford, testified that she has a child, who was three years old in 2004, but the child has always lived with her, and she does not have much contact with her sisters (1022-26).

The IRS does not verify the identity of the named tax filer of an electronically filed return. It trusts that the named filer is actually the person filing the return (328-29).

The refunds claimed on eleven of the returns were directed on the returns for deposit to specified bank accounts or prepaid debit card accounts. On five of the

4

returns, the refunds were directed to accounts in appellant's name. Three of those refunds were actually deposited, for a total of $28,554. Two were not paid. On six of the returns, the refunds were directed to be deposited into accounts in the name of Jennifer Ford. All of those were actually deposited into those accounts, for a total of $60,943. Two refunds on the returns in the name of Veronica White were directed to prepaid cards in her name. One of those refunds was not paid (568-604, 642-700, 919-73, 1030-86).

Documents also showed withdrawals from those accounts to cash, to pay for the tax filing software for the returns, for hotel and travel bills, for merchandise, and for transfers of money among the accounts in the names of the Ford-White siblings, mostly during the periods following the refund deposits (*Ibid*).

The companies that create and sell the software for electronic tax filing, offer it for use on personal computers or via website for downloading. The filer can pay with a credit card. The filer provides an e-mail address to which notices are sent about the status of the return. The filed return also includes an IP address, a series of

5

numbers that exclusively identifies the particular computer from which the return was filed (1134-53). The IRS requires this number, but if the computer used was a corporate in-house device, the IP address would identify the corporation, but not identify the particular device on which the return was filed. The sofware companies keep a copy of the return (473-83, 509, 515, 517, 535), but do not verify the information submitted (552-53).

For the tax year 2004, the records of the electronic tax filing company, Turbotax, indicated that federal returns in the names of appellant, Ford, and Bobby and Veronica White were filed through it. For the year 2005, the returns in the names of appellant, Ford, Veronica White and Kevin Horsey used its software. The IP addresses are the same for all of the 2004 returns and three of the 2005 returns (493-503).

The records of the electronic tax filing company, Taxslayer, indicate that for the tax year 2005, New York State tax returns in the names of for Jennifer Ford, Veronica White, and Kevin Horsey were filed through it. A credit card in the name of Jennifer Ford was used to pay for

the filings. The IP address for the Ford return identifies the computer from which it came (515-34).

The records of the electronic tax filing company, TaxAct, indicated that federal and state returns in the name of appellant had initially been rejected due to a previously filed duplicate with the same social security number. They were later accepted for filing using the company's software and contained an IP address and a credit card number for payment of the fee (537-53).

On March 24, 2006, flight reservations from JFK to Fort Lauderdale, Florida were made online in the names of appellant, and Jennifer Ford. The records indicate that a "Dawn" or a "Jennifer" either called in changes, or made changes at the counter, to the original flight departure dates. The final booking was for a departure on March 29, and a return on March 30. Tickets can be purchased by anyone in the names of the flyers, but flyers must show a photo ID to board (440-61). License records of the New York Department of Motor Vehicles showed photographs and signatures of appellant in 2000 and 2001 and of Jennifer Ford in 2001. The government did not request such records

7

for Veronica White, Bobby White, Emily White, or Candice White (461-72).

Airline records also showed flights from JFK to Orlando, Florida in the names of appellant and Jennifer Ford, departing February 28, 2006, and returning March 6, 2006. One of the prepaid debit cards in the name of appellant was used to purchase the tickets. The same reservations were made in the names of Veronica and Emily White, but different credit cards were used to pay for each of those tickets. There is no way to know who actually purchased the tickets. As long as the flight information was known, the reservations could have been changed by anyone, and identification would not have been required (746-67).

Records of the Crown Plaza Hotel in Orlando, Florida showed reservations in the names of appellant and Jennifer Ford for March 4 through 6, 2006. The same debit cards used to receive the tax refund deposits were used to pay for the rooms. Jennifer Ford had the more expensive bill, including three connecting rooms. A picture ID would have to have been shown at check-in (788-802).

Records of Alamo Rent-a-Car in Orlando, Florida showed a luxury class car rental in appellant's name at the Orlando

airport for the dates March 3 to March 6, 2006. One of the
refund-receiving prepaid debit cards was used for the
rental, and the same e-mail address as that used on the tax
filing software for the returns appeared in the rental
records. There is no way to know who actually made the
reservations or if the renter was actually the driver.
Jennifer Ford was the name used to register the luxury car
at the hotel; a smaller car was registered in the name of
appellant (807-33).

Rafael Castano dated appellant on and off for six years
from 2004 to 2010, except for a break-up for a period in the
fall of 2006. He identified her in court. He met Jennifer
Ford several times, and she stayed in his apartment in New
York City. During the period 2004 through 2006, he lived in
Florida, and appellant in New York, but they carried on
their relationship long distance. Appellant visited him in
Florida on two occasions. One of those occasions was in
March, 2006, when she paid for his flight from Fort
Lauderdale to Orlando, picked him up in a Cadillac, and paid
for their stay at the Radison Hotel. She bought him cologne
from Burberry's. Her sisters, Jennifer, Veronica, and Emily
also stayed separately in the same hotel. Charges for the

9

hotel and cologne appear on the records of the prepaid debit cards in appellant's name. Appellant told him she was "doing well" working for an insurance company in New York. Mr. Castano did not know about, prepare, or attempt to file the 2004 income tax return in his name that was rejected four times. He was dating appellant at the time (882-915).

In addition to the debit card charges on the corresponding dates, for the locations and purchases for the Florida trip, as described by Mr. Castano, the records for the prepaid debit cards in the names of appellant, Ford, and Veronica and Emily White documented the charges for a stay in the most luxurious suite at the Waldorf Astoria Hotel in New York City during May 1 to 3, 2006, in the names of appellant and Ford. There was also a record that someone named Emily White also stayed there at that time (768-81, 658-60, 670-77). The records of the various charges on these cards, and cards in the name of Veronica White, corresponded to the dates that tax refunds were deposited to the accounts. The amounts deposited were the same as the tax refunds, and, in some cases, the debit card records indicated that the funds were from the IRS (568-604, 642-700, 919-73, 1030-86).

10

A debit card withdrawal from a single account was made from banks in different cities, within time periods too short for one person to travel between them. For example, a card in the name of Dawn White was used on May 2, 2006, in New York City at 6:14PM, and on the same day in Elmira, New York at 8:15PM. The cities are a four hour drive apart (Gov't. Exh. 74, appellant's appendix). There were prepaid debit cards in the name of Bobby White, Emily White and Andrea Collins, all with the same home address as appellant, 625A West Water Street, Elmira, New York (686-87).

Anyone can open prepaid debit card accounts on line. Even if, unbeknownst to the company, the person opening the account is not the person whose identifying data is used, the card will be issued. The data need only match other sources for the same data. The company does not verify the data or the signature provided by the applicant for the card (599-601, 700). Money can be loaded onto the card by direct deposit of tax refunds and payroll checks, and by Western Union (575, 644).

The records of the NCO collection agency indicate that someone using the same name as appellant called the agency on March 8, 2006, and gave a debit card number to pay off

11

two different prior credit card debts of $1345.85 and
$521.31. The records of the debit card used showed that five
days earlier on March 3, a deposit of $20,105 had been made
to that debit card account. The caller to the collection
agency stated that an additional $500 owed on the credit
card would be paid when an income tax refund was received.
The record contains the initials "STR" above the words tax
refund. The custodian of the record interpreted those
initials to indicate a state tax refund, but they could just
as well have stood for "sister." Thus, the caller was
waiting to receive the tax refund money from her sister to
pay back the money owed to NCO. On March, 13, 2006, the
caller telephoned and made that payment. The agency had no
way to know who had called in with the debtor information
(838-65).

A signature card evidenced the opening of a bank
account at M and T Bank, Rochester, New York in the name of
appellant on December 16, 2004. The identification used was
a driver's license with the same number as that assigned to
the license of appellant by the DMV. On February 22, 2005,
according to the bank's records, an on-line payment of $6.44
was made from the account via debit card to the electronic

12

tax filing company whose software was used for the filing of the 2004 tax return in the name of appellant. On April 29, 2005, the refund claimed on that return was deposited into the account, and on the same date, at the Oswego branch of the bank, a person identifying herself as appellant withdrew the funds in cash and purchased an official bank check made payable to Jennifer Ford for $591. Official checks leave a more documented paper trail than regular checks drawn on an account. The $591 check was negotiated in the name of the payee several days later (919-42, 960).

An attempted debit card cash withdrawal on a card in the name of appellant for $501 was made on April 29, 2005, at the Oswego branch of M and T Bank, but was rejected for insufficient funds. On the same day, a caller using appellant's name inquired of the debit card company about an expected deposit of a tax refund in the amount of the refund claimed on the Bobby White 2004 tax return. The deposit had not arrived. The caller inquired for several days thereafter, until the card was cancelled on May 10 (590-97, 944-45).

An IRS agent interviewed appellant on her front porch at 625A West Water Street in Elmira, New York on June 20,

13

2006. Appellant said that she paid $50 to a co-worker at the TH Distributing Company named John to prepare and file her 2004 tax return. She worked there as a sales representative for vacuum cleaners. She didn't know John's last name. She gave John her credit card number for the filing fee, her W-2, and a voided bank check to route her refund to her Bank America account, the only one she had had since 2004. She did not mention an account at M and T Bank. She said that she had reviewed the return with John, but then said she had not reviewed it with him. He gave her $495 in cash as her refund (981-93).

Appellant told the agent that she attempted to file her 2005 tax return herself several times with Turbotax, TaxAct, and TaxSlayer software, but she received conflicting e-mails of acceptances and rejections, so she assumed nothing had been filed in 2005. She used her step-father's computer and her sister's rented computer at 625A West Water Street. She said that the amounts on the 2005 return that the agent showed her were wrong; they were too high. She estimated that she had made $14,000 in income, not the $94,000 stated on the return. She did not receive a refund (995-1000).

14

Her employer at TH Distributing testified that he knew no "Johns" who worked for him who prepared tax returns, but there may have been others (393, 398). The IRS agent never looked for John (1010). He arrested appellant on April 15, 2008 (1003).

2.  <u>Denial of Speedy Trial</u>

Appellant and her sister, Jennifer Ford, were first indicted on April 10, 2008, for the tax fraud offenses allegedly committed in 2004 and 2005. Two and a half years later, on October 12, 2010, the indictment (8 Cr. 6075) was dismissed for violation of the speedy trial act (Proceedings and oral opinion, September 29, 2010; order, October 12, 2010).

According to the docket entries and other papers on that indictment, motions by appellant were filed and decided by January 7, 2009, and a trial date of March 9, 2009, was set. Co-defendant Ford, however, had been a fugitive during the period from the unsealing of the indictment in April, 2008, through January 13, 2009, when she was arrested and arraigned. Thereafter, on motion of the government, the trial was "adjourned sine die" (Docket Entry #24). The

government did not make a motion to set a trial date for
another year and half, until July 16, 2010.

Plea negotiations with Ford did not begin until "toward
the end of April, 2009," three months after Ford's
arraignment (Affirmation of Assistant United States
Attorney, Bradley Tyler, dated July 16, 2010). These
negotiations went on for one year and were "terminated" on
March 31, 2010, at which time, Ford requested time to begin
to prepare motions. Her time to do that was extended three
and half more months to July 15, 2010. The Docket Sheet
indicates 15 such extensions for Ford between February,
2009, to August 2, 2010 (*Ibid*). With regard to the last such
extension, issued on July 20, 2010, a retroactive order of
excludable time was issued on July 21, 2010.

On September 20, 2010, appellant moved to dismiss the
indictment on speedy trial grounds, and on September 29,
2010, the Court dismissed the indictment, holding,

> While the Court did grant exclusions
> based on letter applications from Mr.
> Krane [Ford's counsel], the letter
> applications and the corresponding text
> order by the Court did not really specify
> its findings ... other than, for most of
> the time frames referenced, further plea
> negotiations. The Court can find no
> authority that further plea negotiations

16

> without more would be sufficient basis to
> find an interest of justice exclusion.

Proceedings September 29, 2010, at 16-17.

Following the dismissal, the government waited four and
half months, until February 1, 2011, before reindicting
appellant and her sister on the same charges (Ind. # 11 Cr.
6025). Appellant was arraigned on February 15, 2011, and at
proceedings on March 29, stated that she would not be making
motions. Ford's motions were denied on November 29, 2011,
and a trial date was set for January 30, 2012, later amended
to January 27.

On January 24, 2012, the parties appeared for a pre-
trial conference. On the day ordered for the conference, the
government, provided counsel for appellant, for the first
time, a "forensic disk" containing a copy of the hard drive
from a computer seized from Jennifer Ford in 2009, and a
"bunch of documents" related to a separate Discover Card
fraud allegedly committed by Ms. Ford in 2009. The
government represented that its computer expert had
determined  that the computer had not been used prior to
2009, and that no examination had been done to determine if
anything related to the income tax fraud was on it. "We have

to go backward and look at the computer with a different focus, which are there tax information on there."

The government decided "at the 11th hour" to disclose the materials although it did not think it was exculpatory (Proceedings January 24, 2012, at 13-14, 1-7). Counsel for appellant explained that she had not seen these materials previously and that she needed time to have a defense expert examine them. There might be evidence on the computer that Ms. Ford had uploaded information from earlier years related to the charges and to appellant's defense that Ms. Ford was responsible, or that Ms. Ford might have used appellant's identifying information (Proceeding January 24, 2012, at 1-7).

Appellant's counsel stated that among the bunch of documents revealed the day before the conference, were some that indicated that Ms. Ford had possessed debit cards in the same names as the names on the fraudulent tax returns filed in 2004 and 2005, the subject of the charges in the instant indictment. The government replied, "our agent did not look for the information ... this computer was never analyzed for the tax fraud case because we got it three years later." (*Id.* at 10).

18

The Court stated, "it's one case out of your office, the wiser course certainly would have been to say, look at the computer and is there anything; did she maintain a document, did she maintain some type of anything that she could have transferred on." (*Id*. at 14). The Court ordered the government to consult with its computer expert and to report the next day:

> maybe when you talk to him, and he can say, I can tell you there is nothing on there in any way related to taxes, nothing on there related to Dawn White. I mean, if he says that, then I'm possibly going to  go forward. And if it turns out, and if it turns out it is wrong, you risk whatever the appropriate sanctions are.

(*Id*. at 18).

According to the docket sheet, on the next day, January 25, 2012, on appellant's motion, the Court ordered a delay of the trial to March 2, 2012, more than 70 days of includable time since appellant's arraignment on the second indictment, four years after her arraignment on the first indictment, and six years since the crimes were committed.

<u>SUMMARY OF ARGUMENT</u>

Hearsay and documents unauthenticated and unqualified as business records identifying appellant as the author of

19

false tax returns claiming fraudulent refunds were erroneously introduced into evidence, and those unverified and uncorroborated documents, together with evidence of appellant's association with her siblings, exculpatory statements, and expenditure of funds following receipt of the refunds, was insufficient evidence that she had made false claims against the United States.

Evidence, arguendo, that appellant's sister, Jennifer Ford, had filed false tax returns claiming false refunds, and that appellant had also done so around the same time, and that appellant and her sister traveled together and exchanged some funds after the refunds were issued did not sufficiently prove that they had conspired to file the false returns. Defense counsel was ineffective for failing to move to dismiss on this ground.

The four year delay of the trial largely attributed to the government's attempts to convince appellant's sister to become a witness against appellant, and the government's eve of trial disclosure of relevant, and possibly exculpatory, computer evidence and documents of Jennifer Ford's similar crimes, which required a continuance of the trial beyond the 70 day statutory time limit, denied to appellant her

constitutional and statutory rights to a speedy trial. Defense counsel was ineffective for failing to move for dismissal on these grounds.

Losses attributed to Jennifer Ford's filing of false tax returns were improperly included in the calculation of appellant's offense level, because there was insufficient evidence of a conspiracy between them, and even if evidence of a conspiratorial agreement was sufficient, the evidence did not establish that Ford's losses were within the scope of appellant's agreement. Uncharged New York State tax fraud losses were also improperly included in the offense level calculation, because those losses involved a different victim and different harm than those charged in the indictment.

Upward adjustments in appellant's offense level were improperly applied, because the offense did not involve sophisticated means and the use of expropriated identification to obtain a secondary identification.

The District Court employed a fixed and arbitrary sentencing policy which denies a below Guideline sentence to intelligent defendants without criminal records who commit non-violent fraud without humanitarian justification.

21

The requirements that during supervised release appellant submit to drug testing and to searches and seizures without reasonable suspicion of the commission of a crime were not supported by her history and violated statutes and due process of law. Defense counsel was ineffective for failing to raise the above issues at sentencing.

ARGUMENT

POINT I

THE INTRODUCTION INTO EVIDENCE OF HEARSAY
AND UNAUTHENTICATED BUSINESS AND PUBLIC
RECORDS IDENTIFYING APPELLANT AND HER
ALLEGED COCONSPIRATOR AS THE AUTHORS OF
FALSE TAX RETURNS VIOLATED THE RULES OF
EVIDENCE AND CONSTITUTIONAL DUE PROCESS,
FAIR TRIAL AND CROSS- EXAMINATION, AND
THE EVIDENCE WAS INSUFFICIENT AS A MATTER
OF LAW

Unsigned, false tax returns, which were electronically
submitted to the IRS and New York State in 2004 and 2005 in
the names of appellant, her sisters, and others were
erroneously introduced at trial against appellant.[2] There
were no percipient witnesses to the acts of the creation or
submission of the returns. Although the submitted returns
contained electronically generated "IP addresses", a series
of numbers identifying the computers on which the returns
were prepared and submitted, no evidence was presented
connecting those computers to appellant or to her alleged
conspirator, her sister Jennifer Ford. Thus, the tax returns
should have been precluded as unauthenticated and as
containing inadmissible secondary hearsay of the statements
on the returns identifying appellant as one of the filers,

---

[2] Tax agency transcripts of the returns were introduced.

or as one of the attempted filers in the case of some returns which were rejected by the intended agencies.

The returns were concededly false, therefore, an evidentiary foundation for their authenticity as tax returns filed by appellant, or others in a conspiracy with her, was not presented. *F.R. Evid. 901*. They were false, therefore they were not public records "authorized by law." *F.R. Evid. 901(b)(7)(A)*. Although they were filed, or attempted to be filed, with the federal and state tax collecting agencies, they were without trustworthiness as public records of the person who filed them, or attempted to file them. *United States v. Kelley*, 305 Fed. Appx 705, 708 (2d Cir. 2009) (unsigned tax return inadmissible as attribution to defendant); *United States v. Thompson*, 2009 WL 2433477 (S.D.N.Y. 2009) (unsigned tax return found in defendant's possession admissible to prove defendant possessed the information on it, but not her adoption of the statements).

The returns were also inadmissible hearsay as to the statements on them identifying appellant, or any of the others named on the returns, as the filers. As false returns, "the source of information [and] the method or circumstances of preparation indicate a lack of

24

trustworthiness." *F.R. Evid. 803(6)(E)*. It was the regular course of business of the tax agencies to keep the records of these returns, but there was no evidence that the record was made "from information transmitted by someone with knowledge." *F.R. Evid. 803(6)(A)*.

The business records exception to the hearsay rule does not cover statements in the record from a source outside of the business. Only if the custodians of the record, in this case the tax agencies, verify the identities of the sources of the hearsay statements in the records, are those statements admissible. In this case, the agencies did not verify the identities of the filers, the sources of the statements on the returns (328-29, 353-34). *United States v. Reyes*, 157 F.3d 949 (2d Cir. 1998)(prison logbook entries admissible because identity of entrants were verified); *United States v. Blechman*, 657 F.3d 1052, 1065-66)(10th Cir. 2011)(internet records inadmissible because source was not verified); *United States v. Mitchell*, 49 F.3d 769 (D.C. Cir. 1995)(Western Union records inadmissible because the custodian verifies that the recipient of the funds matches the description provided by the sender, but does not verify the identity of the recipient).

25

Although circumstantial evidence may sometimes serve to authenticate a business or public record, and the identifying, or otherwise hearsay, statements in it (*United States v. Natale*, 526 F.2d 1160 (2d Cir. 1975); *United States v. Triumph*, 2004 WL 1920352 (D. Conn. 2004)), in this case, the purported circumstantial evidence itself consisted of unauthenticated, hearsay documents, exculpatory statements, and after-the-fact acts which did not prove a conspiracy, let alone connect defendant to it, or satisfy the government's burden to prove that appellant submitted the false returns.

Three categories of other evidence were erroneously admitted and were insufficiently probative: (1) other documents in the name of appellant and her alleged conspirator, such as prepaid debit card and bank accounts, tax filing electronic software, and airline tickets records containing the hearsay attributions of appellant and her alleged conspirator as the originators, (2) exculpatory statements of appellant, and (3) appellant's expenditures of money for luxury items following the tax agencies' issuance of the falsely claimed refunds, and the exchange of funds between her and Ford.

26

Business records of prepaid debit card and bank accounts, and the tax filing electronic software in appellant's name and the names of her siblings and others were erroneously introduced. These records showed that many of the falsely claimed refunds on the tax returns were paid into those accounts, but as with the tax returns themselves, the identities of the originators of those accounts, which were opened online or over the telephone were not verified. (599-601, 700). Thus, for the same reasons, the business records of those accounts were erroneously admitted in evidence.[3]

Similarly, airline and hotel and car rental records, were introduced to show items and services purchased in the names of appellant and her sister, but those records contained names without verification and were inadmissible. (440-61, 769-833).

The only eyewitness testimony in the case, that of an ex-boyfriend of appellant, was that she and her sisters took a trip to Florida in March, 2006, after the tax refunds were

---

[3] Objections to the various documents on the grounds of lack of foundation for authenticity, business records exception to the hearsay rule, and hearsay within hearsay were made throughout the trial and overruled. (6-19, 319, 322, 368-69, 376, 401-02, 485, 540, 577, 612-13, 627-28, 648, 719-20, 741, 816, 845-46, 923).

issued. That fact, even if proved, that such a trip was taken, and evidence that appellant and her sister exchanged funds, did not prove that the funds from the stolen refunds were knowingly used. There was no such evidence in the case.

And, ultimately, the use of the proceeds of a criminal conspiracy, is not sufficient proof of guilt of the conspiracy or of aiding and abetting, in the absence of other evidence of participation in that conspiracy. *Bollenbach v. United States*, 326 U.S. 607 (1946)(disposing of stolen securities is not guilt of conspiracy to transport the securities across state lines); *United States v. Young*, 745 F.2d 733 (2d Cir. 1984) (possession of unexplained wealth and a rifle in the apartment associated with a drug conspiracy is not sufficient evidence of guilt of the conspiracy); *United States v. Freeman*, 498 F.3d 569 (2d Cir. 1974)(assistance to conspirators after the goals of the conspiracy have been accomplished is not sufficient evidence of guilt of the conspiracy); *Davis v. Lafler*, 658 F.3d 525 (6th Cir. 2011)(breaking down the car stolen in the conspiracy is not sufficient evidence of aiding and abetting the carjacking); *United States v. Heras*, 2009 WL 1874373 (E.D.N.Y. 2009)(Sifton, J.)(the driver aware that the

28

passengers were going to buy drugs not guilty of conspiracy to possess with intent to distribute); cf. *United States v. Bermudez*, 526 F.2d 89 (2d Cir. 1975)(subsequent knowingly illegal criminal acts can be evidence of participation in prior conspiracy).

The government also introduced appellant's statements made to an IRS agent after the refunds were issued. The statements were exculpatory. Even though the government argued that they were false, the only support for that argument was the inadmissible and insufficient documentary evidence discussed above.

The Court, on motion of appellant, did not charge the jury on false exculpatory statement as consciousness of guilt, because "consciousness of guilt is usually the weakest type of testimony." (1114). Thus, the statements were presented to the jury as exculpatory statements; they were not evidence of guilt. And, even as false exculpatory statements they were insufficient, let alone "the weakest type of evidence", because the other evidence in the case was either inadmissible, or insufficient. *United States v. Johnson*, 513 F.2d 819 (2d Cir. 1975); *United States v. DiStefano*, 555 F.2d 1094 (2d Cir. 1977); *United States v.*

29

*Nusraty*, 867 F.2d 759 (2d Cir. 1989). No rational trier of fact could have found guilt beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307 (1979).

The District Court admitted the tax returns, debit card, bank account, and electronic tax filing software company records, over defense objection, on the ground that any issues of authenticity and hearsay within hearsay in the business records were matters of weight for the jury not admissibility for the Court (322, 401-02). The Court also ruled that the attributions of the identities of appellant and others in the unsigned records were admissible as the admissions of a party, or as the *res gestae*, the object of the crime itself (368-69, 612-13, 627-28, 741).

For all of the reasons argued above, it is submitted that the Court could not admit documents for consideration by the jury when those documents did not satisfy the Federal Rules of Evidence qualifications for authenticity and business records hearsay. Unsigned, unattested to documents did not qualify as admissions of a party, and there was insufficient evidence that appellant was the creator.

For example, collection agency records contained notations that following the payment of refunds, a person

30

using appellant's name telephoned in a payment of a debt
owed by a person with appellant's name (855-65). The
notation in the collection agency record of the telephone
caller identifying herself with appellant's name was the
clearest example of the hearsay-within-hearsay bar of
Federal Rule of Evidence 805.

There was no external evidence that the appellant on
trial made that telephone call; the caller paid the debt
with one of the prepaid debit cards in appellant's name, but
the card  was not such evidence, because the card itself
suffered from the same insufficiency under Rule 805. There
is no rule that would allow one inadmissible hearsay
document to bootstrap the admissibility of another such
document.

There were two instances of questioned documents
containing signatures in appellant's name: an employment
application (Ex. 16.10, 365-78), and a bank signature card
(Ex. 56, 923-25). The Court ruled outside the jury's
presence that with respect to those documents, they were
independently authenticated as admissions of appellant,
because the jury could compare the questioned signatures
with the known signatures of appellant on her driver's

31

licence records which also contained her photograph (461-72, 723). The Court, however, did not so instruct the jury, and the government did not ask the jury to make this comparison, therefore the documents were erroneously admitted in evidence based on the names alone.[4]  Again, it is the Court which was supposed to decide preliminary questions of admissibility. *F.R. Evid. 104(a)*.

The employment application should not have been admitted, because it was evidence of an uncharged bad act, irrelevant and prejudicial to a fair verdict on the crimes charged. The application contained allegedly false information about appellant's prior employments. That appellant lied on this application was irrelevant to whether she had filed false tax returns. It tended to improperly prove that she had a predisposition to lie, which could not but have prejudiced the jury against her. *F.R. Evid. 404(b); Old Chief v. United States*, 519 U.S. 172 (1977).

<u>POINT II</u>

THE EVIDENCE OF CONSPIRACY AND AIDING AND
ABETTING WAS INSUFFICIENT AS A MATTER OF

---

[4] A comparison of the signatures does not in fact render a conclusion of their identity more probable than not, let alone beyond a reasonable doubt.

32

LAW, AND THE FAILURE OF DEFENSE COUNSEL
TO MOVE TO DISMISS ON THIS GROUND
DEPRIVED APPELLANT OF EFFECTIVE
ASSISTANCE OF COUNSEL

Even if the admissible evidence had been sufficient to prove that appellant filed false tax returns and obtained the fraudulent refunds, it was insufficient to prove a conspiracy between her and her sister, Jennifer Ford to do so. The evidence, at best, showed that Jennifer Ford also filed false tax returns and obtained fraudulent refunds, but it showed only simultaneous, not joint, similar criminal acts by the sisters.

The only other evidence arguably linking the two were their family relationship, their travel together and their exchanges of money after the refunds were issued. This was not sufficient evidence of a prior agreement between the two to act jointly to accomplish a joint objective. Even Jennifer Ford at her plea allocution stated, "I filed my own, she filed her own, around about the same time..." (Proceedings January 26, 2013, at 32).

A conspiracy requires a meeting of minds on a joint objective. Simultaneous separate criminal acts by two people, even with knowledge of the others' acts, is not sufficient. At most, appellant and Ford "agreed to commit

33

the offenses against the United States, but they did not agree on the same offense." *United States v. Rosenblatt*, 554 F.2d 36, 40 (2d Cir. 1977).

In *Kotteakos v. United States*, 328 U.S. 750 (1946), the Supreme Court held that the simultaneous commission of the same criminal offense by several people connected to a central organizer did not constitute a conspiracy, but, rather, separate offenses, or separate conspiracies to the extent that each was in a conspiracy with the central organizing person.

The Court analogized the arrangement to separate spokes emanating from the hub of a rimless wheel. In this case, there was no organizing person at the center hub. There were just the separate spokes, appellant and Ford, even less of a joinder than in *Kotteakos*. "Joinder is not permitted when the connection between different groups is limited to a few individuals in common to each, but where the individuals commit separate acts that involve them in separate offenses with no common aim." *United States v. Triumph Capital Group*, 260 F.Supp.2d 432, 438 (D. Conn. 2002); *United States v. Nettles*, 570 F.2d 547 (5th Cir. 1976).

34

Nor would the sisters' knowledge of each other's fraud have supplied the rim rendering their acts part of a single conspiracy. As this Court said in the case which was reversed by *Kotteakos, supra*, only on the issue of prejudice, "we assume that [defendants] knew that Brown was for the time being acting as a broker for a number of other persons, who were getting loans in fraud of the act, and who where making false representations to the bank like those which they themselves were making. But that was not enough to make them conspirators with the other applicants ..." *United States v. Lekacos,* 151 F.2d 170, 173 (2d Cir. 1945), rev'd on other grounds, *Kotteakos v. United States, supra*.

The sisters' association and communication with each other is insufficient to establish a conspiracy between them. Nor is it sufficient to prove aiding and abetting (*United States v. Cruz*, (363 F.3d 187 (2d Cir. 2004)), and, indeed, the exchange of money between them, which occurred after the commission of the crimes, would not be sufficient to form the rim of a conspiracy or to show the support for the other's crime prior to its commission, necessary for proof of aiding and abetting. "A person cannot be found guilty of aiding and abetting a crime that already has been

committed." *United States v. Hamilton*, 334 F.3d 170, 180 (2d Cir. 2003); *United States v. Bollenbach, supra*; *United States v. Young, supra*; *United States v. Freeman, supra*; *United States v. Lafler, supra*. No rational trier of fact could have concluded beyond a reasonable doubt that a conspiracy existed. *Jackson v. Virginia, supra* at 307.

Appellant's trial and sentence were certainly prejudiced by the unfair conviction for conspiracy, and by inclusion of all of the extraneous evidence against Ford. The evidence of Jennifer Ford's alleged participation heavily skewed the weak evidence against appellant (Point I, *supra*) by the weight of the sisters' association with each other, and appellant's sentence would have been reduced substantially since the greater part of the gain was ostensibly Ford's. *Kotteakos v. United States, supra.*

Appellant's counsel at trial did not move to dismiss on this ground; however the error is plain, seriously affecting the fairness and integrity of the trial and verdict. *F.R. Crim.P.* 32(b); *United States v. Olano*, 507 U.S. 125 (1993). Furthermore, counsel was ineffective on this point and throughout the trial in failing to move to dismiss on this ground, failing to move for dismissal on speedy trial

36

grounds (Point III, *infra*), failing to introduce exculpatory evidence (Point III, *infra*), and failing to object at sentencing to the Guidelines calculation (Point IV). *Strickland v. Washington,* 466 U.S. 668 (1984).

<u>POINT III</u>

> THE FOUR YEAR DELAY OF TRIAL AND THE MORE THAN 70 DAYS OF INCLUDABLE TIME BETWEEN ARRAIGNMENT AND TRIAL DEPRIVED APPELLANT OF HER STATUTORY AND CONSTITUTIONAL RIGHTS TO A SPEEDY TRIAL, AND THE FAILURE OF DEFENSE COUNSEL TO SO MOVE AND TO INTRODUCE AT TRIAL EVIDENCE BELATEDLY DISCLOSED BY THE GOVERNMENT RELEVANT TO HER DEFENSE DEPRIVED HER OF EFFECTIVE <u>ASSISTANCE OF COUNSEL</u>

Appellant's trial on the instant charges was delayed for four years after she was first arraigned in April, 2008, for the crimes that occurred in 2004 and 2005. Fifteen months of that four year delay, from January, 2009 through March, 2010, was due to the government's attempt to negotiate a cooperation agreement with appellant's co-defendant, her sister, Jennifer Ford. Once those negotiations failed, an additional 18 months was ostensibly allotted to Ford to make motions. Appellant then moved for speedy trial dismissal, and it was granted, but without prejudice to reindictment. (See Docket Entries, *U.S. v. Ford*, Ind. #08-6075, Appellant's Appendix.

37

The government waited another four and half months to reindict for the same crimes, and eight months more were granted to Ford to make the motions she had already been given 18 months to make on the previous indictment. See the Docket Sheet, *U.S. v. Ford*, Ind. #11-6025. Appellant's appendix.

Thus, at least two years of the inordinate delay in bringing appellant to trial was directly attributed to the government, and the government was probably indirectly responsible for the two additional years during which negotiations with Ford continued under cover of the extraordinary time she was allowed to make motions. None of this delay was attributable to appellant, who made motions directed at the first indictment within six months of her arraignment, and who promptly announced she would make no motions directed at the second indictment. *Ibid.*

Then, after the four years of pre-trial delay, on January 24, 2012, three days before trial was scheduled to start on the second indictment on January 27, 2012, the government finally obtained Ford's agreement to plead guilty and disclosed to appellant a computer hard drive seized from Ford in 2009 and documents connecting Ford to a separate

38

fraud committed by Ford using false credit and debit cards in the same names as those used in the false filings charged in the instant indictment.

The government claimed that it had never examined the computer for evidence related to the instant indictment. The government could not assure the Court that this previously undisclosed evidence, the files on the computer and the documents, did not relate to the charges to be tried in three days hence, and that they did not contain possibly exculpatory evidence, therefore, the Court continued the trial to March 2, 2012, more than seventy days of includable time from the date of her arraignment on the second indictment on February 15, 2011.

Appellant submits that this is a history of the violation of her statutory and Sixth Amendment rights to a speedy trial. To the extent that her trial counsel failed to move against the second indictment, it is a violation of her right to effective assistance of counsel.

This Court reviews  the factual history and applicable law of trial delay for clear error and *de novo*, respectively. *United States v. Lynch*, 726 F.3d 346 (2d Cir. 2013). It reviews dismissals with or without prejudice by

the abuse of discretion standard (*United States v. Anderson*, 902 F.2d 1105 (2d Cir. 1990)), and it reviews the Constitutional Sixth Amendment rights to speedy trial and effective assistance of counsel according to the factors set forth in *Barker v. Wingo*, 407 U.S. 514 (1972) and *Strickland v. Washington*, supra.

Although the plain error standard of review is inapplicable to Speedy Trial Act violations (*United States v. Abad*, 514 F.3d 271 (2d Cir. 2008)), it is available for review of Constitutional Speedy Trial error. Since trial counsel would not be expected to assert his own ineffectiveness, this Court reviews the record on that claim *de novo.* Due to counsel's failure, the District Court did not make specific factual findings regarding speedy trial on the second indictment, but, as will be seen below, it did indicate that the government would be sanctioned if the trial was delayed because the government could not guarantee that the computer disclosed on the eve of trial was irrelevant to the case (Proceedings January 24, 2012 at 18).

Appellant was denied her statutory and Constitutional rights to speedy trial, because she was not brought to trial within seventy days of includable time after her arraignment

on the second indictment. The seventy day period expired on February 7, 2012, but the trial did not start until March 2, 2012.

The includable time clock on the second indictment started, at the latest, on November 29, 2011, when the District Court adopted the Magistrate Judge's report recommending denial of the Ford motions. Thereafter, the trial was scheduled to start on January 27, 2012, within the seventy day period from the date Ford's motions were denied. It was adjourned, however, to a date beyond the includable seventy day period, because the prosecutor had neglected prior to January 24, 2012 to conduct an examination of a piece of evidence which required the additional time beyond February 7 to complete.

Furthermore, because the government failed to disclose Ford's computer and the documents concerning Ford's similar crimes, prior to January 24, the defense needed the additional time to conduct its own forensic examination of the computer and to review the documents to determine whether to introduce any resultant evidence in support of the defense that Ford alone was responsible for the fraud.

41

The Speedy Trial Act excludes from the computation of the seventy day period, time periods which are necessary to the ends of justice (18 U.S.C.§3161(h)(7)(A)), but it specifically excepts from such excludable periods, thus rendering them includable, those periods due to the negligence of the prosecution.

> No continuance ... shall be granted
> because of ... lack of diligent
> preparation ... on the part of the
> attorney for the government.

*18 U.S.C. §3161(h)(7)(c)*. Thus, the District Court was precluded from granting the continuance of trial beyond February 7, notwithstanding a defense request necessitated by the prosecution's failure of due diligence in examining the computer and disclosing it and the documents to the defense, as the District Court stated, prior to the "11th hour" (Proceedings January 24, 2012, at 13).

The prosecutor admitted that he had had the computer in his possession for four years, since its seizure from Ford in 2009. The documents belatedly disclosed with the computer revealed that the fraud in connection with which it had been seized included the same names and debit and credit cards used in the charges on trial, therefore there was no legitimate excuse for his failure to examine it in

42

connection with this case and to turn it, and the Ford documents, over to the defense during those four years, instead of waiting to the eve of trial with the Speedy Trial time clock at the 11th hour.

On January 24, when the disclosures were made, the District Court Judge was aware that the prosecutor's conduct might require dismissal of the indictment for violation of the Speedy Trial Act. He told the prosecutor that if he could not assure the Court by the next day that the computer contained nothing on it relevant to the charges in the instant indictment, "you risk whatever the appropriate sanctions are." (Proceedings, January 24, 2012, at 18).

The only appropriate sanction was dismissal of the indictment. The Speedy Trial Act precluded a further excludable continuance beyond February 7, but due to the prosecution's lack of diligence, or bad faith, more time than that was necessary to examine the evidence to assure preparation of an adequate defense, therefore, the trial could not proceed.

This disregard of the Speedy Trial Act was the last straw in the history of unjustifiable prosecutorial delay of the case over the preceding four years, from the initial

43

arraignment on the first indictment, which was itself dismissed on motion of the appellant for violation of Speedy Trial. The final 11th hour disclosure of the computer and documents on the eve of trial on the second indictment was the ultimate instance in the chronic series of delays detailed in the Statement of Facts, *supra*, and in the opening paragraphs of this argument: fifteen months to negotiate a cooperation agreement with the codefendant, followed by eighteen months for that same defendant to make motions to allow those negotiations to continue, followed by dismissal of the indictment for Speedy Trial delay, followed by four and half months of delay of reindictment, followed by eight more months to allow the co-defendant to make motions she had already been granted eighteen months to make under the first indictment, followed by the 11th hour guilty plea deal with the codefendant and disclosure that the prosecution was not ready for trial because it had not examined evidence in its possession since 2009.

Appellant submits that this is the kind of history of prosecutorial delay and bad faith that the Second Circuit posited could render otherwise excludable periods of delay includable. *United States v. Anderson supra* at 1105, 1109.

44

The delays were "chronic" over the four years from indictment to trial. Bad faith is apparent in the deliberate withholding of the Ford computer and fraud documents, the prosecutorial unreadiness regarding that evidence on the eve of trial, and the unreasonable lengths of time it accorded itself at appellant's speedy trial expense to turn Ford as a prosecution witness.[5]

These same factors contribute to the conclusion that appellant's Sixth Amendment Constitutional rights to a speedy trial were also violated. The length of delay was extraordinary ("Post accusation delay [is] 'presumptively prejudicial' at least as it approaches one year." *Doggett v. United States*, 505 U.S. 647, 652n.1 (1992)); the causes were not legitimate; appellant objected and attempted to vindicate her rights in her denied motion to dismiss the first indictment with prejudice, and she was prejudiced for the four years of her life on hold, living in a YMCA during the proceedings, and faced with the possible tampering of

---

[5] Although Ford was not called as witness at trial, her name was on the government's witness list, and pursuant to her guilty plea concurrent with disclosure of her computer and the documents related to her frauds, she received a sentence of probation.

evidence long withheld from her. *Barker v. Wingo, supra*, at 30.

This Court has held that it is the government that assumes the risk for institutional delays caused by plea negotiations with a codefendant and that the defendant does not waive speedy trial rights because of such negotiations. *United States v. New Buffalo Amusement Corp.*, 600 F.2d 368, 278 (2d Cir. 1979). So, such negotiations with a codefendant are all the more destructive to a defendant's speedy trial rights when the defendant intends to go to trial, but must wait years for the government to attempt to turn the codefendant: "We do not read *Barker* as indicating that the duty of the state to bring a defendant to trial is postponed or minimized by a [codefendant's] continuing, although unsuccessful, efforts to obtain a favorable plea. We conclude that under such circumstances appellant's delay in making a prior demand for a speedy trial is not sufficient to vitiate a violation of their Sixth Amendment rights." *Ibid*.

In *United States v. Didier*, 542 F.2d 1182 (2d Cir. 1976), this Court reversed and dismissed an indictment where the government was granted delays of 28 months following a

46

mistrial while it sought the cooperation of a witness against the defendant. "At best the requested delay was a government maneuver designed to bolster the case against [the defendant] ... the desire to gain such a tactical advantage, however, is not a sufficient reason for trial delay." *Id* at 1187.

And, even in a case where "the showing of prejudice ... is not particularly strong", this Court has concluded that the Sixth Amendment was violated where the delay was long; the causes were charged against the government, and "what tips the scale in appellant's favor is the conceded violation of the Speedy Trial Act" in the failure to have the trial commence within the statutory period. *United States v. Carini*, 562 F.2d 144, 151-52 (2d Cir. 1977). That violation of the Act, "assumes much greater importance when those thirty-one days are viewed against the pre-existing background of protracted dely directly or constructively charged to the government." *Id* at 152.

With regard to the prejudice against appellant, the Supreme Court holds, "... consideration of justice is not limited to the specifically demonstratable ... we generally have to recognize that excessive delay presumptively

compromises the reliability of a trial in ways that neither party can prove, or for that matter identify." *Doggett v. United States, supra* at 655.

When the parties returned to Court on January 25, 2012, the day after the government's production of the Ford computer and documents to appellant, the prosecutor stated that he could not assure the Court that the computer and accompanying materials were not relevant to the upcoming trial. (Proceedings January 25, 2012, at 18-20). He claimed that he could not search the computer because the warrant he had sought only permitted a search of the separate Ford Discover Card fraud. *Ibid*. However, that fraud related to the fraud charged in this case, so the warrant would have covered it and, in any case, he had never sought a warrant to search the computer for evidence in this case, the probable cause for which was obvious from the evidence in the accompanying documents that Ford was using fraudulent identification information to make or use fraudulent credit or debit cards in the names of the same people as those in the instant indictment.

He argued that the existence of the computer and the nature of the separate case against Ford were known to the

48

defense soon after the seizure in 2009, because the information was available online (*Id* at 3-12). Although defense counsel admitted that she accidently became aware of the search warrant for the computer and documents, when she was in court on something else and saw that a separate case against Ford was going on. She looked up the case online and saw that a search warrant had been issued, but she was never informed by the prosecutor, until the proceedings on January 24, 2012, that the computer and documents had been seized and were in the possession of the government, and she had made a Rule 16 and Brady disclosure motion for all potentially exculpatory material. The return on the search warrant was filed online under a different Magistrate number, not the complaint number she had accessed to learn of the issuance of the warrant. (*Ibid*).

Thus, the responsibility for the delayed disclosure was the government's as argued above, but the defense counsel failed to move for dismissal of the indictment, and, instead asked for the trial continuance. That failure to move for dismissal and accession to the continuance was a failure of effective assistance of counsel. *Strickland v. Washington, supra*. The obvious prejudice to appellant is that she

49

needlessly suffered a trial verdict of guilt, and a three year sentence that should not have happened.

Furthermore, appellant's defense at trial was that Jennifer Ford was responsible for creating the false tax returns and had used appellant's identifying information. The evidence that Ford had engaged in the same kind of fraud, apart from appellant, was relevant to that defense, yet counsel failed to introduce that evidence at trial.[6] Appellant was deprived of effective assistance of counsel. *Strickland v. Washington, supra.*

<u>POINT IV</u>

<u>APPELLANT WAS SENTENCED IN VIOLATION OF STATUTES, GUIDELINES AND CONSTITUTIONAL DUE PROCESS OF LAW, AND DEFENSE COUNSEL'S FAILURE TO OBJECT DEPRIVED APPELLANT OF EFFECTIVE ASSISTANCE OF COUNSEL</u>

It is submitted that several errors were made in appellant's sentencing and that the resultant sentence was unreasonable: (1) her guideline offense level was based on losses which were not within the scope of a conspiratorial agreement; (2) her offense level was erroneously adjusted upward by two points for sophisticated means;(3) her offense level was erroneously adjusted upward by two points for using a means of identification to obtain another means of

---

[6] The documents have been requested from trial counsel, but have not yet been received.

identification; (4) her sentence was based on uncharged, non-relevant conduct; (5) she was denied a below guideline sentence based on a fixed and erroneous sentencing policy; and (6) drug testing was imposed as a condition of supervised release without evidence of a history of drug abuse by appellant and she was already subject to searches on reasonable suspicion of anything.

1. Losses Not Within the Scope of a Conspiratorial Agreement

As argued in Point II, *supra*, the evidence established at most that appellant and Jennifer Ford engaged in simultaneous, separate similar offenses, not in one conspiratorial joint agreement to commit the same offense. Thus, the losses resultant from Ford's losses were not within the scope of a conspiratorial agreement between her and appellant. This is the case even if appellant had knowledge of Ford's criminal acts.

This Court holds that losses caused by the criminal acts of another person are not counted in a defendant's Guideline base offense level, unless the District Court specifically finds at sentencing that the losses were within the scope of the defendant's conspiratorial agreement with that other person and that the losses were reasonably

51

foreseeable by the defendant. Those requirements are separate and distinct, and the satisfaction of the forseeability requirement does not also satisfy the scope of agreement requirement, and vice versa. Thus, even if Ford's losses were foreseeable to appellant they could not be counted in her offense level calculation. The evidence did not show a conspiratorial agreement (Point II, *supra*), therefore, Ford's losses were not chargeable to appellant. Even if there was an agreement, the evidence showed that Ford's losses were not within the scope of appellant's particular part of that agreement, therefore, they could not be counted in her base offense level. *United States v. Studley*, 47 F.3d 569 (2d Cir. 1995).

Appellant was held responsible for all of the intended losses attributed to both her acts and to the acts of Jennifer Ford, a total of $134,195. This resulted in ten points added to the base offense level of six. *U.S.S.G. 2B1.1*; PSR ¶114. She should have been held responsible only for the acts and resultant losses attributed to her, a total of $54,514. See government exhibit 180.01, Appellant's Appendix. Only six points should have been added to her base offense level of six, for a total of 12 points. Assuming

52

arguendo that the other upward adjustments and calculations were correct (but see *infra*), her total offense level should have been at most sixteen, and her range of imprisonment twenty-one to twenty-seven months.[7] Restitution should be adjusted accordingly.

No objection was made by defense counsel to the Guideline calculation, which this Court reviews with a "relaxed" plain error standard (see *infra*), and for this failure of representation by counsel, among the many others raised in this appeal (see Points Two and Three, *supra*, and in the following sections, *infra*), appellant was denied effective assistance of counsel. *Strickland v. Washington, supra*.

2.    Unsophisticated Means

Appellant's Guidelines were clearly erroneously adjusted upward by two points for sophisticated means, under U.S.S.G.2B1.1(b)(10)(c), on the basis of her use of tax preparation software and prepaid debit cards. Presentence Report ¶117. This increase in her Guideline level was not warranted. The tax preparation software was publicly available and devised for use by unsophisticated taxpayers

_____

[7] Jennifer Ford received a sentence of probation.

who merely answer questions on the website, which converts
the answers into the information required for the 1040
income tax form (475-76). And, as Jennifer Ford, stated
during her guilty plea allocution, the website provides to
the user the possible increasing tax refund amounts
corresponding to various amounts of income and taxes
withheld.

> You enter your W-2 information, it tells
> you how much your refund is before you
> actually submit it to the IRS. It gives
> you an estimated amount. And we know what
> the amount was going to be. And by
> changing the information we inputted into
> the tax filing, we made the refund
> larger.

Proceedings, January 26, 2012, at 32.

As the Court in *United States v. Executive Recycling, Inc.*,

___ F. Supp.2d ___, 2013 WL 3010821*26 (D.Col. June 17,

2013), stated

> if the Court were to find that the use of
> a website - particularly one as
> rudimentary as Executive Recycling's
> website - constituted 'sophisticated
> means', then the enhancement would apply
> in nearly every fraud case, which surely
> could not have been the Sentencing
> Commission's intent when it adopted this
> enhancement guideline.

The tax returns and the debit cards were for the most
part in the names of Ford and appellant, and the tax returns

54

themselves stated that the falsely claimed refunds were to be deposited to the specified accounts in their respective names. Indeed, the government itself argued that this was an unsophisticated fraud.

> if Jennifer Ford was so clever and sophisticated, why did she file tax returns in her own name? Why did she put fraudulent proceeds in cards, or prepaid debit cards, as you saw, in her own name? Why did she, if she is so clever and sophisticated, spend $50,000 within a four-month period of time after all these false tax returns had been filed, if she was so clever. Clearly putting stuff in your name is not clever or sophisticated, rather it's a recipe or road map to get caught easily. Now, wouldn't a sophisticated criminal not use their own identity? Isn't the purpose of stealing somebody else's identity so you don't use your own name in the middle of the fraud or the middle of the crime? Clearly, the 19-year-old at the time, I think 20 the next year, Jennifer Ford, was not a sophisticated and clever criminal. **What we have in this case, simply, are two sisters, both very young and very unsophisticated, who discovered a way to get easy money by filing false tax returns. That is what we have A fairly simple straight forward fraud, not a sophisticated identity theft case.**

(1159) (emphasis added).

Sophisticated means are defined as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense ... Conduct such as

55

hiding assets or transactions, or both, through the use of
fictitious entities, corporate shells, or offshore financial
accounts also ordinarily indicates sophisticated means."
U.S.S.G. §2B1.1 cmt.n. 8(B).

The means used in this case were certainly no more
sophisticated than that in *United States v. Valdez*, 726 F.3d
684, 695 (5th Cir. 2013) where the Court overturned a
finding of sophisticated means.

> Here, however, the sole reason given for
> applying this enhancement is that Valdez
> took money directly deposited from
> Medicare into his operating account,
> which was in his name, and moved it into
> his investment accounts, which were also
> in his name. Even though this court
> reviews the factual finding that Valdez
> used sophisticated means for clear error,
> see Clements, 73 F.3d at 1340, there is
> no indication that this open and
> transparent direct deposit and movement
> of funds involved sophisticated means or
> could have made it more difficult for his
> offense of health care fraud to be
> detected. We hold that the district court
> erred in applying the 2-level §2B1.1
> (b)(9)(C) sophisticated means enhancement

Appellant submits that this error was plain and that
defense counsel was ineffective for failing to raise it.

This Court has reviewed unobjected to errors at
sentencing with a relaxed plain error standard, because
remand for correction of the error does not impose the

56

burdens of a new trial or dismissal of the indictment. *United States v. Leung*, 40 F.3d 577, 586n.2 (2d Cir. 1994); *United States v. Baez*, 944 F.2d 88, 90n.1 (2d Cir. 1991); *United States v. Sofsky*, 287 F.3d 122, 125 (2d Cir. 2002). "Imposition of a sentence in violation of law would be plain error." *United States v. Eng*, 14 F.3d 165, 172n.5 (2d Cir. 1994).

Also, defense counsel's failure to object to this error, among all of the other such failures, was ineffective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668 (1984).

3.   <u>The Identification Adjustment</u>

Appellant's sentence was erroneously upwardly adjusted two points on the grounds that the "offense involved means of identification of another", particularly the identifications of her brother Bobby White and an acquaintance Kevin Horsey. Presentence Report ¶116. This adjustment was clearly and plainly erroneous, because, the adjustment (U.S.S.G. §2B1.1(b)(11)(c)(i)) is not applicable merely for the use of the identification of another.

The Guideline requires for its application, "the unauthorized ... use of any means of identification

unlawfully to produce or obtain any other means of identification." That was not the grounds on which the adjustment was applied here, therefore the points should be deducted and appellant's sentence reduced or the case should be remanded for resentencing. See *United States v. Sash*, 396 F.3d 515 (2d Cir. 2005).

Appellant submits that this error was plain, and that defense counsel was ineffective for failing to raise it, therefore for the reasons stated in subsections 1 and 2, *supra*, the Court should review it and reverse.

4.   Non-relevant Conduct

Appellant was charged with, and convicted of, submitting false claims to the United States, specifically to the Internal Revenue Service, in the form of false federal tax returns, and of conspiracy so to do (Indictment, Appellant's Appendix). *18 U.S.C.§§286, 287*. The base level for the offenses should have been calculated according to the amounts of realized and intended losses involved in the false claims against the United States, the amounts claimed on the false federal income tax returns. *U.S.S.G. 2B1.1*.

Erroneously, however, added to these amounts, were the amounts of false claims made on New York State income tax

58

returns attributed to her and her sister, Jennifer Ford. These false returns were introduced at trial as evidence of the charged crimes, but they were not charged in the indictment, nor could they have been since they were purely state offenses.

The state false filings were not part of the offense of conviction, therefore, the losses resultant from their filings could be in included in the total losses for determining appellant's base offense level for sentencing, only if they satisfied the requirements of the controlling relevant conduct Guideline, U.S.S.G. 1B1.3(a)(2). That Guideline provides that losses incurred by acts that were "part of the same course of conduct or common scheme or plan as the offense of conviction" can be counted as relevant conduct "solely with respect to the offenses of a character for which §3D1.2(d) would require grouping of multiple counts."

The filing of false State tax returns, even if they could have been charged as separate counts in the federal indictment, are not offenses for which §3D1.2(d) would require grouping with the offenses of filing federal tax returns. The victims and harms are different, losses to the

59

New York State Treasury and losses to the United States Treasury.

U.S.S.G. §3D1.2(d) states that, "all counts involving substantially the same harm shall be grouped", and it specifies some examples of "same harm" as including, "when the offense level is determined largely on the basis of the total amount of harm or loss ..." *Ibid*. Presumably, if the State tax fraud case had been a count in the federal indictment, the final offense level would be determined by the total amount of the losses incurred as a result of all of the offenses, and therefore it would appear that it would be grouped with the federal tax offenses similarly based on the amount of losses. As an uncharged offense, therefore, the State tax fraud would arguably qualify as relevant conduct to the federal tax offenses. That was the rationale probably employed, although unstated by the Probation Department and the District Court in enhancing appellant's base level for the federal tax offenses by the losses resultant from the State offenses. Appellant submits, however, that the rationale was erroneous.

The State tax fraud was not relevant conduct to the federal tax fraud, because the victims and the harms were different. Even if the base offense levels of two offenses

60

are calculated by the level of losses resultant from each,
as the State and federal fraud offenses are in this case,
one is not relevant conduct to the other if their victims or
harms are different. *United States v. Szur*, 289 F.3d 200 (2d
Cir. 2002) (fraud and money laundering offenses arising out
of the same criminal transaction have different victims and
harms); *United States v. Sabbeth*, 262 F.2d 207 (2d Cir.
2001); *United States v. Atlantic States Cast Iron Pipe Co.*
627 F. Supp. 180 (D. N.J. 2009) (violations of the
Occupational Safety and Hazard Act are not grouped because
violations of the Clean Air Act and violations of the Clean
Water Act have different victims and harms); *United States
v. Gradagno*, 766 F.Supp. 617 (N.D. Ill. 1991) (arson and the
integral mail fraud of documents to claim the insurance not
grouped); *United States v. Ballard*, 919 F.2d 255 (5th Cir.
1990) (two different cars stolen in auto thefts not
grouped); cf. *United States v. Martin*, 157 F.3d 46 (2d Cir.
1998)(uncharged car parts stolen from the same victim as
charged offense grouped as relevant conduct).

Although in some tax offense cases, uncharged state tax
losses have been grouped as relevant conduct to charged
federal tax losses, those were cases of tax evasion, and

61

failure to pay taxes as parts of already grouped underlying schemes. In addition, the harms in those cases were the generalized societal harm of failure to do a duty, to pay debts to the sovereign. *United States v. Fitzgerald*, 232 F.2d 315 (2d Cir. 2000)(and the issue of the relevant conduct inclusion of the state tax losses appears not to have been raised); *United States v. Melot*, 732 F.3d 1234 (10th Cir. 2013); *United States v. Powell*, 124 F.3d 655 (5th Cir. 1997).

This is not a case of failure to pay taxes. It is a fraud case against the federal government, the theft of funds from a specific governmental treasury. The uncharged state theft is against an entirely different and separate victim; there is no underlying groupable illegal scheme from which a tax obligation arose, and the tax harms are to different government treasuries.

If, as in *United States v. Atlantic States Cast Iron Pipe Co., supra*, defrauding two different subagencies of the same federal government should not be grouped, then defrauding two different governments should not be grouped, and one is not relevant conduct to the other. *United States v. Johnson*, 117 F.3d 1010 (7th Cir. 1997) (fraud in one

state against truckers not relevant conduct to failure to pay taxes in another state).

Without discounting the other offense level points erroneously added (see *supra*), appellant's base offense level without the inclusion of the State tax losses would have been two points lower, 18 instead of 20, and her sentence range would have been 27 to 33 months, instead of 33 to 41 months. *U.S.S.G. §2B1.1(b)* (6 points plus 8 for an amount of losses of more than $70,000 but less than $120,000, total level 14, plus upward adjustments of 2 points each for sophisticated means and use of identification). Restitution should be adjusted accordingly.

Defense counsel failed to object to this error at sentencing, and for the reasons stated, this was incompetent representation. *Strickland v. Washington, supra*.

5.   <u>Fixed Arbitrary Sentence Policy</u>

The District Court denied appellant's request for a below Guidelines sentence because:

> The Court next considers whether considering all of the 18 U.S.C. Section 3553 factors that a non-Guideline sentence is warranted in your case. And I frankly find that it is not. One thing comes through loud and clear, you are an intelligent young woman. You are articulate, as witnessed certainly by

> your statements to me. And you -- and I
> know you engaged in this crime. As I
> observed and as Mr. Resnick commented, it
> wasn't -- it wasn't because you needed
> food or you needed to take care of
> somebody or because of some illness. You
> went into this rather sophisticated
> scheme to get money that you blew on
> clothes and the Waldorf, among other
> things. So, I don't find that considering
> the factors that I've gone through ...
> the Court finds that a non-Guidelines
> sentence would be appropriate.

Proceedings, March 7, 2013, at 17-18.

Thus, according to the District Court's policy, intelligent defendants who commit non-violent fraud on an impulse to obtain easy money, even if they have no prior criminal record, cannot get the benefit of a below Guidelines sentence. The Guidelines are regarded erroneously as the presumptively reasonable sentence which is imposed unless the defendant can overcome it with some justification for the crime that satisfies the Court's policy. *Rita v. United States*, 551 U.S. 338, 351 (2007). "We reject, however, an appellate rule that requires 'extraordinary' circumstances to justify a sentence outside the Guidelines range." *Gall v. United States*, 552 U.S. 38, 47 (2007).

It would be the extraordinary circumstances, indeed, where a defendant could convincingly offer proof as demanded

by the Court below, that the crime was committed to get
medicine or food for the sick and hungry. Neither the
Guidelines nor the §3553(a) factors are limited by such
circumstances, and such judicially imposed limitations by
the District Court would be an abuse of discretion and a
violation of the statutory and Constitutional rights to an
individualized sentence according to law.

In a remarkably similar case, this Court reversed a
sentence and remanded where the District Court denied a 25
year old defendant what was then Federal Youth Corrections
Act treatment, analogous to the leniency of a below
Guidelines sentence, because,

> During the rather extended colloquy
> attendant upon her sentencing
> proceedings, the district court made much
> of fact that the appellant came from a
> privileged background rather than from
> 'the ghetto' and was not the 'usual dumb
> kid.' The court referred to her as one
> 'far above the average, so that she knew
> what she was doing.' Understandably, the
> appellant has been left with the
> impression, forcefully argued to us by
> her counsel, that her intelligence and
> privileged background were counted
> against her as pejorative factors
> disentitling her to treatment under the
> Youth Corrections Act ... the court
> employed a fixed and mechanical approach
> in imposing sentence rather than a
> careful appraisal of the variable
> components relevant to the sentence upon
> an individual basis. *Williams v.*

65

> *Oklahoma*, 358 U.S. 576, 585, 79 S.Ct.
> 421, 3 L.Ed.2d 516 (1959); *Williams v.*
> *New York*, 337 U.S. 241, 247-250, 69 S.Ct.
> 1529, 93 L.Ed. 1760(1949). This situation
> requires us to invalidate the sentence.
> *United States v. Brown*, 470 F.2d 285,
> 288-89 (2d Cir. 1972); *United States v.*
> *Baker*, 487 F.2d 360, 362-364 (2d Cir.
> 1974) (Lumbard J., dissenting); *Woolsey*
> *v. United States*, 478 F.2d 139, 143-145
> (8th Cir. 1973).

*United States v Schwarz*, 500 F.2d 1350, 1351-52 [2d Cir.
1974].

6.  Drug Testing and Unreasonable Searches

There is no history of drug abuse, or even of drug
taking, in appellant's background, yet the Court at
sentencing ordered that she submit to drug testing while on
Supervised Release (Proceeding, March 7, 2013 at 20). Drug
testing is not required by statute or guideline, "if the
defendant's presentence report or other reliable sentencing
information indicates a low risk of future substance abuse
by the defendant." *18 U.S.C.§3583(d)*; *18 U.S.C.§3563(a)(5)*;
*U.S.S.G.5D1.3(a)(4)*.

Drug testing is not a condition of supervised release
reasonably related to appellant, her offense, or to
deterrence, rehabilitation, and protection of the public,

the purposes of post-release supervisory conditions. *Fiore v. United States*, 696 F.2d 205 (2d Cir. 1982). There was no allegation that use of alcohol or drugs had anything to do with the commission of the offences.

Thus, the order to submit to drug testing was an overbroad constraint on appellant's liberty, in addition to being unrelated to the offense and the goals of sentencing. *United States v. Sofsky, supra* at 122 (ban on computers); *United States v. Brown*, 402 F.3d 113 (2d Cir. 2005) (ban on debt); *United States v. Myers*, 426 F.3d 117 (2d Cir. 2005) (ban on seeing son); *United States v. Bello*, 310 F.3d 56 (2d Cir. 2002) (ban on TV).

The condition that appellant submit to warrantless searches on reasonable suspicion of anything (*Id* at 21)is overbroad and violative of the Fourth Amendment. Whereas searches of parolees and post-release supervisee's may be justified on reasonable suspicion of commission of a crime or violation of crime-related release conditions, the overbroad conditions in this case would allow such searches on reasonable suspicion that appellant was engaging in otherwise lawful behavior. An extensive general search of

all of appellant's person and property would not be reasonably related to the violation or to some legitimate law enforcement purpose, and hence would violate appellant's Fourth Amendment rights.

The Supreme Court has held that the Fourth Amendment is not violated when a parolee is searched even in the absence of reasonable suspicion (*Samson v. California*, 547 U.S. 843 (2006)), but that decision employed a balancing test of the extremely diminished expectation of privacy of a parolee, who had not completed his term of imprisonment, against the needs of law enforcement to search such a person to ensure compliance with the law as a condition for reentry into society. In this case, appellant will have served her term of imprisonment and therefore will have achieved entitlement to reentry to society when she is on supervised release, and the search condition imposed reaches beyond her person and the insurance of compliance with the law to search everything in her world for no legitimate purpose related to law enforcement.

Although appellant will be on supervised release, and therefore, presumably have a diminished expectation of privacy, the Supreme Court makes distinctions between degrees of diminished expectations of privacy. It held that

68

parolees are at the lowest level of privacy expectation, akin to persons who have no expectations of privacy, but it has held that probationers, who are not serving a prison term, have a significantly greater expectation of privacy, that they cannot be searched without at least reasonable suspicion that they are committing a crime. *United States v. Knights*, 534 U.S. 112 (2001). Appellant is more like the probationer, because she will not be serving a term of imprisonment when she is on supervised release. And, this Court holds that, notwithstanding the diminished expectation of privacy of post-release supervisees, unreasonable, overbroad, unrelated, search conditions violate the Fourth Amendment. *United States v. Lifshitz*, 369 F.3d 173 (2d Cir. 2004)

Defense counsel did not object at sentencing to imposition of the conditions complained of here on appeal, but this Court had held in *United States v. Reeves*, 591 F.3d 77 (2d Cir. 2010), and elsewhere that the plain error standard is relaxed regarding unobjected to supervisory conditions where, as here, the defendant had no notice that the Court would impose them and the issue relates only to sentencing. *United States v. Reeves, supra*, at 80; *United*

*States v. Stofsky*, *supra*, at 125; *United States v. Abrar*, 58 F.3d 43 (2d Cir. 1995). Furthermore, defense counsel was ineffective for failing to object to these conditions.

<u>CONCLUSION</u>

FOR THE ABOVE STATES REASONS, THE
CONVICTION SHOULD BE REVERSED AND THE
INDICTMENT DISMISSED, OR A NEW TRIAL
SHOULD BE ORDERED, OR APPELLANT'S
SENTENCE SHOULD BE ADJUSTED AS REQUESTED,
OR THE CASE SHOULD BE REMANDED FOR
RESENTENCING

Respectfully submitted,


<u>s/ Lawrence Mark Stern</u>
LAWRENCE MARK STERN
100 Hudson Street, #6A
New York, N.Y. 10013
(212) 925-6863
Attorney for Appellant

70

CERTIFICATION OF WORD COUNT

    I, Lawrence Mark Stern, hereby certify that according to the word processor used in the production of this brief, it contains 13,798 words.

s/ Lawrence Mark Stern
Lawrence Mark Stern